2014 OK CIV APP 25

**In re the MARRIAGE OF Amanda Maria VARBEL, Now Pattison, and Brice Duane Varbel.**

**Amanda Maria Varbel, Now Pattison, Petitioner/Appellee,**

v.

**Brice Duane Varbel, Respondent/Appellant.**

**No. 110078.**

Court of Civil Appeals of Oklahoma, Division No. 1.

Feb. 14, 2014.

Jack De McCarty, McCarty & Rigdon, Newkirk, Oklahoma, for Petitioner/Appellee.

Jarrod Heath Stevenson, Stevenson Law Firm, P.L.L.C., Oklahoma City, Oklahoma, for Respondent/Appellant.

WM. C. HETHERINGTON, JR., Vice–Chief Judge.

¶ 1 Brice Varbel (Father) appeals an order modifying previously entered terms of a Decree regarding custody and his visitation with JV (Child). Father alleges the trial court's custody modification is contrary to the best interest of Child and violates statute

by expressing a preference for public schooling. At the outset, we must establish the nature of the matter before us.

¶ 2 Amanda Varbel (Mother) and Father wed on December 1, 2005, and Child was born in September of 2006. On June 4, 2007, Mother filed a Petition for Dissolution of Marriage and the marital union was dissolved in a Decree filed on March 12, 2008.[1] Mother was restored to her maiden name, child support calculations were made, and the parties' debts and property were divided. The Decree provides Mother is "to remain as the primary custodian of the minor child subject to [Father's] frequent and liberal visitation" pursuant to an attached Kay County Standard Visitation Schedule and, when Child reaches 24 months of age, "a plan of shared parenting shall be initiated whereby each party shall enjoy alternating weeks of visitation with the minor child with the parties meeting in Stillwater, Oklahoma for the purpose of child exchange" and no extended summer visitation is to occur "so long as the shared custody plan is in place." In his Brief in Chief, Father states: "Both parties were found fit and awarded joint custody," and the parties appear to have treated the schedule of alternating visitation as a kind of joint custody.

¶ 3 The Decree contains provisions generally encouraging cooperation but does not contain provisions addressing any form of shared decision making. Although the above-quoted language refers to "shared parenting" and "shared custody," there is no joint custody plan as described in 43 O.S.Supp.2009 § 109[2] in the appellate record. Consequently, we conclude the record does not support an assertion the Decree established joint custody. Instead, it appears the Decree provides for primary custody of Child with Mother, and what began as standard visitation for Father became more extended visitation once Child attained age 2. This distinction is important because it affects both what the parties needed to demonstrate for a change in the Decree's original provisions and it affects our review.[3]

## STANDARD OF REVIEW

¶ 4 Custody and visitation are matters of equity and are left to the sound discretion of the trial court. *Kahre v. Kahre*, 1995 OK 133, ¶ 19, 916 P.2d 1355, 1360. "Accordingly, unless we determine that the trial court's decision is clearly against the weight of the evidence so as to constitute an abuse of discretion, it will not be disturbed. *Boatsman v. Boatsman*, 1984 OK 74, 697 P.2d 516." *Williamson v. Williamson*, 2005 OK 6, ¶ 5, 107 P.3d 589, 591. "An abuse of discretion occurs when a decision is based on an erroneous conclusion of law, or where there is no rational basis in evidence for the rul-

1. Contrary to the claim in Father's statement of facts in his Brief in Chief, paragraph 3 of the Decree provides for payment of support. However, support was not an issue raised at hearing and it is not an issue on appeal.

2. In particular, the appellate record lacks a joint custody plan meeting the requirements of 43 O.S.Supp.2001 § 109 which provide:
   C. If either or both parents have requested joint custody, said parents shall file with the court their plans for the exercise of joint care, custody, and control of their child. The parents of the child may submit a plan jointly, or either parent or both parents may submit separate plans. Any plan shall include but is not limited to provisions detailing the physical living arrangements for the child, child support obligations, medical and dental care for the child, school placement, and visitation rights. A plan shall be accompanied by an affidavit signed by each parent stating that said parent agrees to the plan and will abide by its terms. The plan and affidavit shall be filed with the

petition for a divorce or legal separation or after said petition is filed.
   D. The court shall issue a final plan for the exercise of joint care, custody, and control of the child or children, based upon the plan submitted by the parents, separate or jointly, with appropriate changes deemed by the court to be in the best interests of the child. The court also may reject a request for joint custody and proceed as if the request for joint custody had not been made.

3. A modification of initial placement of primary custody with one parent requires a showing of a permanent and material change of conditions and that the child would be substantially better off with the change. When joint custody is ended, the trial court applies the "best interests of the child" test pursuant to 43 O.S.Supp.2009 § 109(A), just as it would do in a first instance custody determination. *Daniel v. Daniel*, 2001 OK 117, ¶ 21, 42 P.3d 863, 871.

ing." *In the Matter of BTW,* 2008 OK 80, ¶ 20, 195 P.3d 896, 908.

¶ 5 As stated *Fox v. Fox,* 1995 OK 87, ¶ 7, 904 P.2d 66, 69:

> The evidentiary requirements for a change of a permanent custody order are well established. In *Gibbons v. Gibbons,* [1968 OK 77], 442 P.2d 482 (Okla.1968), we held that the parent asking for modification must establish: 1) a permanent, substantial and material change in circumstances; 2) the change in circumstances must adversely affect the best interests of the child; and, 3) the temporal, moral and mental welfare of the child would be better off if custody is changed. Finding that the paramount consideration in awarding custody on a motion to modify is what appears to be in the best interests of the child in respect to its temporal, mental and moral welfare, and the entire determination must be in light of what is in the child's best interest, *Gibbons* was reaffirmed in *David v. David,* [1969 OK 164, ¶ 8], 460 P.2d 116 (Okla.1969). In *David v. David,* [1969 OK 164, ¶ 8], 460 P.2d 116, 117 (Okla.1969), we said, "The law is clear that in a hearing upon a motion to modify, the burden is upon the applicant to show a substantial change in conditions since the entry of the last order or decree which bears directly upon the welfare and best interest of the child." And more recently in *Gorham v. Gorham,* [1984 OK 90], 692 P.2d 1375 (Okla.1984), we emphasized the necessity to show a direct and adverse effect on the child's best interests.

¶ 6 "One who alleges error in the trial court's determination on visitation must put forth the evidence upon which he relies and must affirmatively show how the determination is contrary to the best interest of the child." *K.R. v. B.M.H.,* 1999 OK 40, ¶ 18, 982 P.2d 521, 524. (Citation omitted.) "The trial court is entitled to choose which testimony to believe as the judge has the advantage over this Court in observing the behavior and demeanor of the witnesses." *Mueggenborg v. Walling,* 1992 OK 121, ¶ 7, 836 P.2d 112, 114.

## FACTS

¶ 7 The parties' current dispute began over Child's schooling. Mother, a public school graduate, favors a public school education for Child. Father was home schooled to an eighth grade equivalency and then was advanced enough to enter public school at grade nine. He favors home schooling.

¶ 8 In April of 2011, Mother informed Father she wanted Child to attend a Ponca City Public School System Pre–K program. Father opposed the enrollment, told her he thought home schooling was best, and claimed it would cause his visitation to be limited to weekends. Mother testified he became "a little irate," she discontinued the conversation, and she told him, "Okay, well, obviously we can't come to an agreement, so I'll just file a motion and bring it to court." Father testified that when he tried to discuss public schooling versus home schooling with Mother, she told him she would take him to court and hung up on him. On the day after the April telephone conversation, Mother enrolled Child in the Pre–K program which was to begin on August 10, 2011.

¶ 9 On June 13, 2011, Mother filed a Motion to Modify Decree of Divorce, claiming a permanent, substantial and material change of circumstances affecting the best interest of Child required a change in custody and visitation, namely, Child's attainment of school age. In her motion, she seeks "full physical custody" of Child and asks that Father be awarded visitation according to the Kay County Standard Visitation Schedule provisions and in conjunction with Child's educational enrollment in the Ponca City public school system.

¶ 10 In his response to Mother's motion, Father also claims there had been a permanent, substantial, and material change of circumstances. He asserts Child would be "unquestionably better off" if placed in his "full legal custody." Father alleges Mother has "made every effort" to minimize his involvement in Child's life and claims "[t]here are no factors that would justify" Mother being "granted legal custody." [4]

---

4. As described above, in making their claims and assertions, both parties mistakenly characterize

¶ 11 In a "Counterclaim For Legal Custody" filed on July 25, 2011, Father alleges various reasons [5] Mother's custody of Child should be disfavored. Father argues Child was enrolled in a public school Pre–K program by Mother so as to minimize his involvement and that he and Child's paternal grandmother have initiated an education plan for Child's transition to school. He also cites efforts by Child's paternal grandparents (including their relocation near him and the alteration of his father's work participation) which allow them to provide care and educational assistance, the presence of other family members near his location, how child has only been cared for by family members (as opposed to day care) when with him, and his flexibility at work as factors favoring his own primary custody of Child. He contends Child has thrived with the current visitation schedule, he should have "full legal custody," and Mother should be granted liberal visitation.

¶ 12 On August 9, 2011, the trial court conducted a scheduling hearing and entered an interim order. A minute order for that date provides Father would have visitation with Child every other weekend from Friday at 6 p.m. until Sunday at 6 p.m.

¶ 13 Hearings on Mother's motion to modify began on August 30, 2011, and were completed on October 6, 2011. At completion of the first phase of hearing, following a request by Father's counsel and without any objection by Mother, the trial court appointed a guardian ad litem. Father's counsel then noted the parties were off record at the time of entry of the August 9, 2011 interim order and renewed an objection to the interim order, claiming it had allowed Mother to "unilaterally" change the visitation schedule. When stating the objection, counsel also claimed Father had offered a solution on August 9, 2011, which would allow Child to keep on track with home schooling which had been overruled by the trial court. At the close of the first phase of hearing, the trial court ordered Father to have visitation every weekend.

¶ 14 During hearings, the trial court heard testimony about the parties' handling of issues such as social interactions, activities, and nutrition/meal habits. The trial court also heard testimony about the parties' respective educations, employment, and work schedules. The trial court heard other evidence relative to the issues raised in the counter motions for modification.

¶ 15 Since age one, Child has attended day care when Mother was at work. After the marital dissolution, Mother lived with her parents until April of 2010, when they relocated to Louisiana due to her Father's job. For two years prior to that time Mother dated Ted Rains (Rains), and when her parents moved, she and Child began to live with Rains. She and Rains were not engaged or married. She takes Child to school in the morning. Rains acts as a step parent and sometimes transports Child for visitation exchanges in Stillwater, Oklahoma when Mother's work schedule conflicts with the visitation schedule. He also picks child up from day care after his work time when Mother's schedule prevents her from doing so. Mother testified Child receives Sooner Care coverage for medical insurance but had no other state assistance enrollment. Mother cited socialization as one factor in favor of public school attendance. She provided as exhibits several photographs of Child with other children, who Mother described some as "cousins, [Rains's] side of the family, nieces and nephews." One photograph label identifies the person with Child as "Grandma Lisa ( [Rains's] Mom)."

¶ 16 Child's maternal grandmother, Debra S. Pattison (Pattison), testified she moved in April of 2010 because the facility where her husband worked closed. Since relocating, she had visited Mother and Child three to five times, most recently in May of 2011. She felt Rains was "a good guy," trusted him, and did not feel there was anything inappropriate about the way he related to Child. Pattison reported Mother and Rains started

the custody order as a joint custody order.

5. Among the reasons he cites are Mother's cohabitation with a man, alleged exposure to tobacco smoke, and her lack of any immediate family in the area.

dating when Child was about 18 months to two years old. She did not know Child was being home schooled. From the time of the Decree in 2008 until the early part of 2010, Pattison stated Mother had used day care for Child only when she worked, and she sometimes had watched Child when Mother worked or if she had to run an errand. Mother then rested.

¶ 17 Father testified that either he or his mother care for Child when she is with him. Father previously trained for and obtained certification as a teacher for grades 6 through 12, but he allowed the certification to lapse due to his current employment. Father has had custody of another child, KV, who is about two and a half years older than Child, since KV was about two years old. KV, who has medical problems, is home schooled. Father describes KV and Child as "very close." Father cites his work flexibility as allowing him to participate in activities with Child and allowing him to promote Child's contact with Mother.

¶ 18 Father put on fairly extensive evidence of the type of materials used for the home schooling, which included materials from an accredited system, and privately accumulated resources such as computer learning programs, flash cards, books, and similar items. Father's mother, Elizabeth Varbel, a lawyer by training, home schooled Father and his sister. She and Father provide home schooling for KV and Child. She described various educational resources she uses for home schooling. Child was age three and a half when she began teaching letters and numbers. Father and his mother both testified they thought Child had regressed educationally and they felt the Pre–K program was below Child's skill level. Father's parents, his sister, and her husband and children live near him. KV's grandmother and her husband are active in both KV and Child's lives.

¶ 19 The Guardian Ad Litem, Chris Landes (GAL), filed a report on October 6, 2011, the day hearing on Mother's motion reconvened. In his report he discounts, contradicts, or finds irrelevant several factors Father cited in his opposition to Mother's motion, finds both parties fit, states both have support systems to help with caring for Child, and has no concerns about their respective homes. GAL notes Child has thrived in the alternating visitation plan and recommends it be continued. The GAL also testified, and he was questioned about his observations and conclusions. GAL felt Child should be placed in Father's primary care if the alternating visitation schedule was not used and the placement would be in Child's best interest. He cited Father's ability to provide additional visitation as situations arose.

¶ 20 Following hearing, the trial court modified the Decree[6] by placing primary custody with Mother and providing for visitation by Father every weekend from 6 p.m. on Friday until 6 p.m. on Sunday, any Federal or State Monday holidays are considered part of the weekend with a 6 p.m. Tuesday return time, and the entire summer vacation excepting two weeks in June and two weeks in July. Mother is ordered to provide Father at least thirty days' notice of which two weeks she has chosen and she may not choose consecutive two week periods such as last two weeks in June and the first two in July. An attached Holiday Visitation Schedule governs all other visitation[7] and sets up a summer visitation schedule if notice is not given timely.

## THE APPEAL

¶ 21 Father appeals, arguing the trial court's modification of the Decree fails to make a determination in Child's best interest and it expresses a bias or preference in favor of public schooling. He alleges Mother unilaterally discontinued the system of alternating weeks of visitation in April of 2011 by enrolling Child in a Pre–K program. The record does not support that assertion. According to the evidence adduced at the hearings, Child's first day of *attendance* at the

---

6. The trial court entered other findings, including those regarding child support and expenses for such things as child care and health costs, none of which are at issue in this appeal.

7. The schedule is tied to school schedules for Child and KV, her older half-sibling.

Pre–K program was August 10, 2011, that is the day after the trial court entered the interim order changing Father's visitation to weekends and twenty days before hearings began on the Mother and Father's respective motions.

¶ 22 Father also complained of a period when Mother did not keep to the alternating week schedule due to Child's infection with head lice and the failure of the first attempted treatments for the condition. The dates this occurred were not elicited in the testimony.

¶ 23 Section 112(D)(1) of Title 43 provides that "[e]xcept for good cause shown, a pattern of failure to allow court-ordered visitation may be determined to be contrary to the best interests of the child and as such may be grounds for modification of the child custody order." On its face, this statute recognizes a *pattern* of conduct may serve as the basis for a custody modification, and it also contains an exception allowing good cause to be shown for interrupting visitation. " 'Good cause' is determined by application of equitable principles." *King v. King,* 2005 OK 4, ¶ 18, 107 P.3d 570, 578. The record does not demonstrate a pattern of denial of visitation and good cause was shown for the single episode of temporary denial of visitation.

¶ 24 Both parties cite Child's attainment of school age as a change of condition. However, the mere fact there has been a change of condition since entry of the last order, standing alone, is *not* sufficient for a change of custody because, as cases have long recognized, the change *also* must *adversely* affect a child's temporal, moral and mental welfare so as to necessitate the trial court's alteration of the current custodial placement. *See, e.g., Daniel v. Daniel,* 2001 OK 117, 42 P.3d 863; *. Fox v. Fox,* 1995 OK 87, 904 P.2d 66; *Pirrong v. Pirrong,* 1976 OK 36, 552 P.2d 383; *Owens v. Owens,* 1972 OK 26, 494 P.2d 318; *Gibbons v. Gibbons,* 1968 OK 77, 442 P.2d 482; *Johnson v. Wingert,* 2011 OK CIV APP 128, 268 P.3d 145. The record does not support a conclusion Child has suffered an adverse effect necessitating a change in the current custodial placement.

¶ 25 Father contends the trial court exhibited an impermissible preference for public schooling over home schooling. His mother testified she had purchased the Calvert home schooling system in June of 2011, Child had begun to use it, and if the system, which was one approved by the State of Oklahoma, was used for two years Child might have been allowed to skip a grade upon changing to public school if she was ahead of her cohort in the public school. In other words, both Father and his mother considered Child as capable of excelling. However, the trial court also heard evidence that the public school system was considering changes which would result in children attaining an even later age before entering school, *i.e.,* making a policy decision resulting in more maturity at each subsequent grade level. The record shows the trial court considered all the evidence concerning both educational approaches. As noted above, primary custody in the Decree was placed with Mother. Cooperative decision-making is a worthy and important goal, but as Child's primary custodian, participation in the Pre–K program is within the purview of her control. As Mother points out, Father testified he had planned to home school Child only until first grade, only a short time beyond pre-school. However, Father did qualify his plan as an "initial" one, subject to revision. Even so, the selection of public school for early education by Mother is not demonstrated to be adverse to Child's interest so as to qualify as a change of condition. Father's job, which he has held since 2007, *i.e.,* before the marital dissolution, may allow him more flexibility to facilitate visitation, but that factor alone is insufficient to justify a change of custody under the circumstances and it is not a change in the conditions post-dating the Decree.

¶ 26 Lastly, Father raises an issue regarding alleged "violence" by Mother towards KV, presumably occurring while the parties were married. The trial court stopped the line of inquiry and refused to allow exploration of facts predating the 2008 marital dissolution. As to "Rulings on Evidence," the Legislature has provided, in 12 O.S.2011 § 2104 that:

A. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of a party is affected, and:

\*      \*      \*      \*      \*      \*

2. If the ruling is one excluding evidence, the substance of the evidence was made known to the judge by offer or was apparent from the context within which questions were asked.

Father did not make an offer of proof regarding excluded evidence of such behavior by Mother nor did he attempt to elicit any evidence of more recent events after the period excluded. We will not address an issue not properly preserved. *See Irwin v. Irwin,* 1966 OK 146, 416 P.2d 853.

*CONCLUSION*

¶ 27 Father has not presented clear and convincing evidence of a change of condition such that the order of the trial court is contrary to the weight of the evidence and results in an abuse of discretion. The order is **AFFIRMED.**

JOPLIN, P.J., and BUETTNER, J., concur.